--------------------------
**CASE NO. 13-30358**
--------------------------

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**


**AMERICAN COMMERCIAL LINES, L.L.C.**

**Third Party Plaintiff - Appellant**


**v.**


**ENVIRONMENTAL SAFETY & HEALTH CONSULTING SERVICES, INCORPORATED; UNITED STATES ENVIRONMENTAL SERVICES, L.L.C.**

**Third Party Defendants - Appellees**

----------------------------------------------------------------------------------------------------


------------------------------------------------------------
**On Appeal from the United States District Court
for the Eastern District of Louisiana**
------------------------------------------------------------

-------------------------------------------------------------------------
## ORIGINAL BRIEF ON BEHALF OF APPELLANT, AMERICAN COMMERCIAL LINES LLC
-------------------------------------------------------------------------

GLENN G. GOODIER (#06130) – Lead Counsel
RICHARD D. BERTRAM (#17881)
Jones Walker LLP
201 St. Charles Avenue – 48th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8174
Fax: (504) 589-8174
Email: ggoodier@joneswalker.com
Attorneys for American Commercial Lines LLC,
Appellant

OF COUNSEL:

JOHN A. V. NICOLETTI
TERRY L. STOLTZ
Nicoletti Hornig & Sweeney
Wall Street Plaza, 88 Pine Street, 7th Floor
New York, New York 10005-1801
Telephone: (212) 220-3830
Fax: (212) 220-3780
Email: jnicoletti@nicolettihornig.com
Attorneys for American Commercial Lines LLC,
Appellant

## CERTIFICATE OF INTERESTED PARTIES
## REQUIRED BY LOCAL RULE 28.2.1

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.     American Commercial Lines LLC, Appellant;

2.     American Commercial Lines Inc., ultimate parent of Appellant;

3.     Glenn G. Goodier and Richard D. Bertram of Jones Walker LLP, 201 St. Charles Avenue, 48th Floor, New Orleans, LA 70170, Counsel for American Commercial Lines LLC, Appellant;

4.     John A.V. Nicoletti, Terry L. Stoltz and Richard W. Stone, II of Nicoletti Hornig & Sweeney, Wall Street Plaza, 88 Pine Street, 7th Floor, New York, New York 10005-1081, Counsel for American Commercial Lines LLC, Appellant;

5.     Environmental Safety & Health Consulting Services, Incorporated, Appellee;

6.     Edwin Christian Laizer, James Ted Rogers, III and Margot L.K. Want of Adams & Reese, L.L.P., Suite 4500, 701 Poydras Street, 1 Shell Square, New Orleans, LA 70139, Counsel for Environmental Safety & Health Consulting Services, Incorporated, Appellee;

7.  United States Environmental Services, L.L.C., Appellee;

8.  Lawrence I. Kiern of Winston & Strawn, L.L.P., 1700 K. Street, N.W., Washington, D.C. 20006, Counsel for United States Environmental Services, L.L.C., Appellee;

9.  William Sean O'Neil, Suite 340, 2000 S. Dairy Ashford Street, Houston, TX, Counsel for United States Environmental Services, L.L.C., Appellee;

10. William E. O'Neil of O'Neil Group, L.L.C., 5905 Cleveland Place, Metairie, LA 70003, Counsel for United States Environmental Services, L.L.C., Appellee;

11. United States of America, Plaintiff in the action below;

12. Michael A. DiLauro and Sarah S. Keast, Trial Attorneys, Aviation & Admiralty Litigation, Torts Branch, Civil Division, U.S. Department of Justice, 1425 New York Ave., N.W. Suite 10146, Washington, D.C. 20005, Counsel for United States of America, Plaintiff in the action below;

13. D.R.D. Towing, LLC, Defendant in the action below; and

14. Leo M. Prange, III, 917 N. Causeway Boulevard, Metairie, LA 70001, Bankruptcy Counsel for D.R.D. Towing, LLC, Defendant in action below.

This 15th day of July, 2013.

> /s/ Glenn G. Goodier
> GLENN G. GOODIER (#06130) – Lead Counsel
> RICHARD D. BERTRAM (#17881)
> Jones Walker LLP
> 201 St. Charles Avenue – 48th Floor
> New Orleans, Louisiana 70170-5100
> Telephone: (504) 582-8174
> Fax: (504) 589-8174
> Email: ggoodier@joneswalker.com
> Attorneys for American Commercial Lines LLC, Appellant
>
> OF COUNSEL:
>
> JOHN A. V. NICOLETTI
> TERRY L. STOLTZ
> Nicoletti Hornig & Sweeney
> Wall Street Plaza, 88 Pine Street, 7th Floor
> New York, New York 10005-1801
> Telephone: (212) 220-3830
> Fax: (212) 220-3780
> Email: jnicoletti@nicolettihornig.com
> Attorneys for American Commercial Lines LLC, Appellant

## STATEMENT REGARDING ORAL ARGUMENT
## PURSUANT TO LOCAL RULE 28.2.4

Oral argument is requested because this matter involves a case of first impression concerning the interplay between the Oil Pollution Act of 1990, ("OPA"), 33 U.S.C. §§ 2701-61 (2006), and admiralty and maritime law.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES
    REQUIRED BY LOCAL RULE 28.2.1 ........................................ i

STATEMENT REGARDING ORAL ARGUMENT
    PURSUANT TO LOCAL RULE 28.2.4....................................... iv

TABLE OF CONTENTS ............................................................... v

TABLE OF AUTHORITIES........................................................... vi

JURISDICTIONAL STATEMENT ................................................ 1

STATEMENT OF THE ISSUE PRESENTED ........................... 1

STATEMENT OF CASE ............................................................... 1

STATEMENT OF FACTS............................................................ 3

SUMMARY OF THE ARGUMENT ..................................... 10

STANDARD OF REVIEW ................................................... 11

ARGUMENT ....................................................................... 12

       POINT I....................................................................... 12

       OPA DOES NOT PREEMPT FEDERAL COMMON LAW OR THE
       GENERAL MARITIME LAW ................................. 12

       POINT II. ..................................................................... 22

       ACL SEEKS TO PREVENT ES&H & USES FROM OVER-
       BILLING FOR THEIR CLEANUP SERVICES ......................... 22

CONCLUSION ..................................................................... 28

CERTIFICATE OF SERVICE................................................ 30

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) .................. 32

# TABLE OF AUTHORITIES

## Cases

*A/S D/S Svendborg v. Marine Engine Specialties Corp.*,
    501 F.2d 376 (2d. Cir. 1974)....................................................................... 25

*ABC Arbitrage Plaintiffs Group v. Tchuruk*,
    291 F.3d 336 (5th Cir. 2002).................................................................. 3, 10

*Arzoomanian v. British Telecommunications, PLC*,
    No. 03-374 PGS, 2007 WL 132983 (D.N.J. Jan. 12, 2007)........................ 23

*Carder v. Continental Airlines, Inc.*,
    636 F.3d 172 (5th Cir. 2011)........................................................................ 11

*Century Building Partnership, L.P. v. SerVAAS*,
    697 N.E.2d 971 (Ind. Ct. App. 1998)........................................................... 27

*Dehoyos v. Allstate Corp.*,
    345 F.3d 290 (5th Cir. 2003)........................................................................ 12

*Ellipso, Inc. v. Mann*,
    583 F. Supp. 2d 1 (D.D.C. 2008) ................................................................. 23

*Exxon Shipping Company v. Baker*,
    554 U.S. 471 (2008) ............................................................................... 13, 14

*First National Bank of Dickson v. Garrett*,
    36 B.R. 432 (M.D. Tenn. 1984) ................................................................... 28

*Frankel v. ICD Holdings, Inc.*,
    939 F. Supp. 1124 (S.D.N.Y. 1996)............................................................. 28

*Gabarick v. Laurin Maritime (America) Inc.*,
    623 F. Supp. 2d 741 (E.D. La. 2009) ...................... 12, 14, 16, 19, 20, 21, 22

*Green v. State Bar of Tex.*,
    27 F.3d 1083 (5th Cir. 1994)........................................................................ 11

*Hamilton v. Canal Barge Co., Inc.*,
    395 F. Supp. 978 (E.D. La. 1975) ............................................................... 25

*Hamilton v. United Healthcare of Louisiana, Inc.*,
    310 F.3d 385 (5th Cir. 2002) ................................................................. 11, 12

*In re Cornmesser's Inc.*,
    264 B.R. 159 (W.D. Pa. 2001) ...................................................... 27

*In re Katrina Canal Breaches Litigation*,
    495 F.3d 191 (5th Cir. 2007) ................................................... 3, 10

*In re Matter of Crist*,
    632 F.2d 1226 (5th Cir. 1980) ...................................................... 20

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*,
    808 F. Supp. 2d 943 (E.D. La. 2011) .......................................... 13, 14, 15, 20

*Jandrain v. Lovald*,
    351 B.R. 679 (D.S.D. 2006) ...................................................... 23

*Keybank National Assoc. v. Perkins Rowe Assocs., Inc.*,
    No. 09-497-JJB-SR, 2011 WL 3204687 (M.D. La. July 27, 2011) ............. 23

*Luera v. M/V Alberta*,
    635 F.3d 181 (5th Cir. 2011) ...................................................... 1

*Malina v. Gonzales*,
    994 F.2d 1121 (5th Cir. 1993) ...................................................... 12

*McKinney v. Irving Independent School Dist.*,
    309 F.3d 308 (5th Cir. 2002) ...................................................... 11

*Mowbray v. Cameron County, Tex.*,
    274 F.3d 269 (5th Cir. 2001) ...................................................... 11

*Nassif v. Sunrise Homes, Inc.*,
    No. 98-C-3193, 739 So.2d 183 (La. 06/29/99) ............................ 25

*Nat'l Shipping Co. of Saudi Arabia v. Moran Trade Corp.*,
    1998 AMC 163 (4th Cir. 1997) ...................................................... 15

*Palmer v. Chamberlin*,
    191 F.2d 532 (5th Cir. 1951) ...................................................... 17

*Prudence Realization Corp v. Jackson*,
    212 F.2d 362 (2d Cir. 1954) ....................................................................... 27

*Robinson v. Louisiana Dock Co.*,
    Nos. 99-1996 and 00-3601, 2001 WL 1175114
    (E.D. La. October 3, 2001) ........................................................................... 25

*Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*,
    350 U.S. 124 (1956) ..................................................................................... 24

*Smith v. Noble Drilling Co., Inc*,
    272 F. Supp. 321 (E.D. La. 1967) ................................................................ 27

*Sonnier v. State Farm Mut. Auto. Ins. Co.*,
    509 F.3d 673 (5th Cir. 2007) .................................................................... 3, 10

*South Port Marine, LLC v. Gulf Oil Ltd. P'ship*,
    56 F. Supp. 2d 104 (D. Me. 1999) ............................................................... 15

*Steele v. Drummond*,
    275 U.S. 199 (1927) ..................................................................................... 17

*U.S. v. Oswego Barge Corp.*,
    664 F.2d 327 (2d Cir. 1981) ......................................................................... 19

*United States v. Texas*,
    507 U.S. 529 (1993) ..................................................................................... 13

*United States v. M/V Big Sam*,
    681 F.2d 432 (5th Cir. 1982) ........................................................................ 19

## Statutes

28 U.S.C. § 1291 .................................................................................................... 1

28 U.S.C. § 1331 .................................................................................................... 1

33 U.S.C. § 905 .................................................................................................... 24

33 U.S.C. § 1251 *et seq.* (2000 ed. and Supp. V) ............................................... 13

33 U.S.C. § 1321(c)(4)A ...................................................................................... 18

33 U.S.C. § 2703(c)(2) ............................................................................... 23

33 U.S.C. § 2709 ....................................................................................... 16

33 U.S.C. § 2710(c) ....................................................................... 11, 16, 21

33 U.S.C. § 2751 ................................................... 11, 14, 15, 19, 20, 21

33 U.S.C. §§ 2701-61 (2006) ........................................................... iv, 21

33 U.S.C. § 2718 ....................................................................................... 15

## Rules

Rule 12(b)(6) ............................................................................. 10, 11, 12

Rule 28.2.1 ...................................................................................................i

Rule 28.2.4 ................................................................................................. iv

Rule 54(b) .................................................................................. 1, 3, 27

# JURISDICTIONAL STATEMENT

The District Court had admiralty and maritime jurisdiction under 28 U.S.C. § 1333(1) (R.Doc. 86, pp. 5-6). *Luera v. M/V Alberta*, 635 F.3d 181, 188-89 (5th Cir. 2011). There is jurisdiction under 28 U.S.C. § 1291 over this appeal from the District Court's Rule 54(b) judgment dismissing with prejudice the third-party complaint by American Commercial Lines LLC ("ACL") against Environmental Safety and Health Consulting Services, Inc. ("ES&H") and United States Environmental Services, LLC ("USES") (R.Doc. 93).

# STATEMENT OF THE ISSUE PRESENTED

The District Court erred in dismissing the third-party complaint against ES&H and USES because OPA does not preempt ACL's claims under admiralty and maritime law (R.Doc. 86, pp. 8-11).

# STATEMENT OF CASE

On July 23, 2008, a collision occurred in the Mississippi River in New Orleans Harbor between the M/V TINTOMARA and the barge DM-932, under the tow of the tug MEL OLIVER. The collision resulted in a large oil spill from the DM-932 into the Mississippi River.

As the owner of the DM-932, ACL was designated as a potential Responsible Party under OPA. In compliance with its obligations under OPA,

ACL promptly contracted with several Oil Spill Response Organizations ("OSROs"), including ES&H and USES, to clean up the spill. ES&H rendered invoices to ACL totaling $14,591,165.05 and USES billed ACL a total of $19,723,881.30. As is customary, ACL arranged to have all the OSRO invoices audited by Maritime Alliance Group, Inc. ("MAGI"). While the audit was ongoing, ACL made payment of $10,654,165.05 and $13,410,641.10 to ES&H and USES, respectively.

Even though the audits were ongoing, MAGI was waiting for ES&H and USES to submit proper supports for the remaining invoiced amounts and no decision had been made by ACL as to the final amount properly due to ES&H and USES, ES&H and USES chose to forgo completion of the audits and to file claims with the National Pollution Funds Center ("NPFC"). The NPFC ultimately paid $3,071,222.83 to ES&H and $1,519,564.74 to USES.

The United States filed a complaint to recover from ACL the moneys paid to ES&H and USES (R.Doc. 1), despite ES&H's and USES's refusal to properly document their invoices pursuant to the governing law and the terms of the contract (R.Doc. 11, ¶ 30). In turn, ACL filed a third-party complaint against ES&H and USES alleging that if ACL is found liable to the United States for non-contractual over-payments by the NPFC to ES&H and USES, ACL is entitled under admiralty and maritime law to indemnity from ES&H and USES for those

payments, together with any "processing fee" that the United States collects in connection with those payments (R.Doc. 11, ¶ 22).

USES, ES&H and the United States moved to dismiss the third-party complaint (R.Docs. 31, 32 and 35). In considering the motions, the District Court had to accept as true ACL's factual allegations in the third-party complaint that the United States had made non-contractual payments to ES&H and USES (*i.e.* for phantom labor and equipment never supplied and at hourly rates applicable to properly qualified, legal workers for workers who were not properly qualified or legally entitled to work) (R.Doc. 11, ¶ 22). *See Sonnier v. State Farm Mut. Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007) (citing *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007)); *see also ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 341 (5th Cir. 2002). The District Court granted the motions on the legal conclusion that ACL's admiralty and maritime claims were preempted by OPA (R.Doc. 86). The District Court then entered a Rule 54(b) final judgment dismissing the third-party complaint with prejudice (R.Doc. 93). ACL filed a timely notice of appeal (R.Doc. 94).

## STATEMENT OF FACTS

At approximately 0130 hours on July 23, 2008, a collision occurred on the Mississippi River at or near Mile 98 AHP between the M/V TINTOMARA and the

Barge DM-932 while the Barge DM-932 was being towed by the Tug MEL OLIVER (R.Doc. 11, ¶ 10). The Barge DM-932 was damaged, sank and rendered a total loss (R.Doc. 11, ¶ 12). The barge had been carrying a cargo of fuel oil that was spilled into the Mississippi River (R.Doc. 11, ¶ 13).

The Coast Guard was notified of the collision, the discharge of fuel oil from the Barge DM-932 and the resulting damages. The Coast Guard identified the Barge DM-932 as the source of the discharge and notified ACL, as the owner of the Barge DM-932, that it may be liable as "a responsible party" pursuant to OPA for removal costs and damages. ACL reserved all defenses to the designation as a responsible party, including but not limited to, the right to assert that the discharge of oil and resulting damages or removal costs were caused solely by the act or omission of a third party (R.Doc. 11, ¶ 14).

As a designated "responsible party" under OPA, ACL was required to clean up the oil spill (R.Doc. 11, ¶ 15). ACL and its underwriters immediately took steps to comply with ACL's obligations. A number of OSROs were appointed to undertake the cleanup. Further, MAGI was appointed to help oversee the cleanup effort including conferring with the representatives of ACL, the United States Coast Guard and the State of Louisiana in order to decide how to best respond to the spill and to organize the cleanup.

## ES&H AGREEMENT, AUDIT AND NPFC CLAIM

One of the OSROs appointed by ACL was ES&H.  ES&H, who had a published rate sheet (R.Doc. 50-1, Lane Decl. ¶ 4, Exh. 1), entered into an oral contract with ACL (R.Doc. 11, ¶ 17; R.Doc. 50-1, Lane Decl. ¶ 4).  On July 29 and August 4, 2008, MAGI met with ES&H to negotiate certain rate reductions from ES&H's published rate sheet and to be sure that ES&H understood the requirements for invoicing for its services (R.Doc. 50-1, Lane Decl. ¶ 4).  During the meeting with ES&H, ES&H was advised that:

a.     Before commencing work each morning, every laborer had to attend a safety meeting.  In order to verify that the laborer worked on a given day, he was required to sign in at the safety meeting and sign out at the end of the day.  ES&H was required to submit the sign in sheets with its invoices.

b.     In order to collect per diem meal allowances, every laborer had to sign a per diem log which had to be submitted with ES&H's invoices.

c.     The maximum hours worked by any laborer had to be consistent with the Site Safety Plan.  For the period from July 29 to August 2, the allowed hours were from 0600 to 1800 hours.  Beginning on August 3, the allowed hours were from 0630 to 1800 hours.

d.     All material and equipment used in the clean-up, including boats and booms, had to be decontaminated at ACL's time and expense before it would be released back to ES&H.  ES&H would not be paid for any material or equipment that did not go through decontamination.

(R.Doc. 50-1, Lane Decl. ¶ 4, Exh. 2).

ES&H invoiced ACL a total of $14,591,165.05 of which $10,654,165.05 was paid (R.Doc. 11, ¶ 18; R.Doc. 50-1, Lane Decl. ¶ 5).[1]  Of the remaining balance of $3,937.075.50, MAGI's audit established that $3,115,444.28 was in dispute as not properly supported (R.Doc. 50-1, Lane Decl. ¶ 5, Exh. 3), even without taking into consideration whether the laborers supplied by ES&H were properly trained, legal workers (R.Doc. 50-1, Lane Decl. ¶ 6).

ES&H knew that they were required to provide properly trained, legal workers to perform the cleanup.  In a spill of this type, a laborer engaged in cleanup activities was required to have 24 hours of basic training, with an 8 hour refresher course every year thereafter (R.Doc. 50-1, Lane Decl. ¶ 6).  A preliminary audit of the training certificates produced by ES&H established that only 22.7% of the laborers provided by ES&H had the required training certificates (R.Doc. 50-2).

ES&H never provided the additional documentation requested by the MAGI auditors, the federally required I-9 forms or the certificates evidencing that its labor force had received the required training for the cleanup of the oil spill (R.Doc. 11, ¶ 19).

---

[1] ACL acknowledges that there is a slight difference in the amounts billed as set forth in the third-party complaint and in the Lane Declaration.  The difference is insignificant.

Rather than providing the requested documentation and completing the audit as required by the contract, ES&H filed a series of claims with the NPFC totaling $3,327,117.09 (R.Doc. 11, ¶ 20).

ACL has been advised that the NPFC, without requesting production of the documents ES&H was required to produce to ACL in order to complete a proper audit, has awarded ES&H $3,071,222.83 (R.Doc. 11, ¶ 21).

## USES AGREEMENT, AUDIT AND NPFC CLAIM

Another one of the OSROs appointed by ACL was USES. USES, who had a published rate sheet (R.Doc. 50-3, Lane Decl. ¶ 4, Exh. 2), entered into a contract with ACL (R.Doc. 11, ¶ 24; R.Doc. 50-3, Lane Decl. ¶ 4, Exh. 1). On July 29 and August 3, 2008, MAGI met with USES to negotiate certain rate reductions from USES's published rate sheet and to be sure that USES understood the requirements for invoicing for its services (R.Doc. 50-3, Lane Decl. ¶ 4). During the meeting with USES, USES was advised that:

a.    Before commencing work each morning, every laborer had to attend a safety meeting. In order to verify that the laborer worked on a given day, he was required to sign in at the safety meeting and sign out at the end of the day. USES was required to submit the sign in sheets with its invoices.

b.    In order to collect per diem meal allowances, every laborer had to sign a per diem log which had to be submitted with USES's invoices.

c.    The maximum hours worked by any laborer had to be consistent with the Site Safety Plan. For the period from July 29 to August 2, the allowed hours were from 0600 to 1800 hours. Beginning on August 3, the allowed hours were from 0630 to 1800 hours.

d.    All material and equipment used in the clean-up, including boats and booms, had to be decontaminated at ACL's time and expense before it would be released back to USES. USES would not be paid for any material or equipment that did not go through decontamination.

(R.Doc. 50-3, Lane Decl. ¶ 4, Exh. 3).

USES invoiced ACL a total of $19,723,881.30 of which $13,410,641.10 was paid (R.Doc. 11, ¶ 25; R.Doc. 50-3, Lane Decl. ¶ 5).[2] Of the remaining balance of $6,313,240.10, MAGI's audit established that $4,575,652.98 was in dispute as not properly supported (R.Doc. 50-3, Lane Decl. ¶ 5, Exh. 4), even without taking into consideration whether the laborers supplied by USES were properly trained, legal workers (R.Doc. 50-3, Lane Decl. ¶ 6).

USES knew that they were required to provide properly trained, legal workers to perform the cleanup.  In a spill of this type, a laborer engaged in cleanup activities was required to have 24 hours of basic training, with an 8 hour refresher course every year thereafter (R.Doc. 50-3, Lane Decl. ¶ 6).  A preliminary audit of the training certificates produced by USES established that only 42.8% of the laborers provided by USES had the required training certificates (R.Doc. 50-4).

USES never provided the additional documentation requested by the MAGI auditors, the federally required I-9 forms or the certificates evidencing that its labor force had received the required training for the cleanup of the oil spill (R.Doc. 11, ¶ 26).

---

[2] ACL acknowledges that there is a difference in the amounts set forth in the third-party complaint and in the Lane Declaration  (R.Doc. 50-3).  The difference is largely explained by the direct payments to Lawson Environmental Services (R.Doc. 11, ¶ 27).

Rather than providing the requested documentation and completing the audit as required by the contract, USES filed a series of claims with the NPFC totaling $2,214,917.67 (R.Doc. 11, ¶ 28).

ACL has been advised that the NPFC, without requesting production of the documents USES was required to produce to ACL in order to complete a proper audit, has awarded USES $1,519,564.74 (R.Doc. 11, ¶ 29).[3]

## SUMMARY OF THE ARGUMENT

In deciding the Rule 12 motions to dismiss the third-party complaint, the District Court had to accept as true ACL's factual allegations that the NPFC had paid ES&H and USES for phantom labor and equipment that was never supplied during the cleanup of the oil spill and the NPFC had paid ES&H and USES at the rate applicable for properly trained, legal workers for laborers who were in fact either not properly trained or legally entitled to work, or both. *See Sonnier v. State Farm Mut. Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007) (citing *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007)); *see also ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 341 (5th Cir. 2002). Nonetheless, the District Court granted the motions to dismiss on the basis of the legal conclusion that OPA preempted ACL's admiralty and maritime law

---

[3] ACL does not know how the NPFC handled two of USES's claims totaling $553,661.92 (R.Doc. 11, ¶ 29).

indemnity claim (R.Doc. 86).  This conclusion is wrong, especially in light of the savings provision in OPA preserving admiralty and maritime law, 33 U.S.C. § 2751(3)(i), and the section of OPA authorizing ACL to bring an action for recovery against anyone who might be liable to it for sums it has been held liable to pay as a designated responsible party.  33 U.S.C. § 2710(c).

The order and reasons below lead to the bizarre result that allows ES&H and USES to retain sums that they did not earn while leaving ACL and the United States to litigate as to who will bear the loss of those unearned payments.  The judgment should be vacated, ACL's third-party complaint reinstated and the matter remanded to the District Court for further proceedings.

## STANDARD OF REVIEW

This Court reviews a rule 12(b)(6) dismissal *de novo*.  *Mowbray v. Cameron County, Tex.*, 274 F.3d 269, 276 (5th Cir. 2001).  More particularly, "questions of law are reviewed *de novo*." *Mowbray*, 274 F.3d 269, 276 (citing *Green v. State Bar of Tex.*, 27 F.3d 1083, 1086 (5th Cir. 1994)); *Hamilton v. United Healthcare of Louisiana, Inc.*, 310 F.3d 385, 388 (5th Cir. 2002); *McKinney v. Irving Independent School Dist.*, 309 F.3d 308, 312 (5th Cir. 2002); *Carder v. Continental Airlines, Inc.*, 636 F.3d 172, 174 (5th Cir. 2011) ("Questions of statutory interpretation are, of course, reviewed *de novo*.").  "Where . . . a district

court's ruling on a 12(b)(6) motion to dismiss is based entirely on conclusions of law, this Court reviews that determination *de novo*." *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 294 (5th Cir. 2003) (citing *Malina v. Gonzales*, 994 F.2d 1121, 1124 (5th Cir. 1993)).  "Rule 12(b)(6) motions should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hamilton v. United Healthcare of Louisiana, Inc.*, 310 F.3d 385, 388.

## ARGUMENT

## POINT I.

## OPA DOES NOT PREEMPT FEDERAL COMMON LAW OR THE GENERAL MARITIME LAW

In the consolidated litigation arising out of the collision and oil spill, the District Court has twice had to decide if admiralty and maritime claims were preempted by OPA.  In addition to the matter under appeal, the District Court earlier decided that traditional admiralty and maritime claims against the TINTOMARA and her owner by third-parties allegedly damaged by the spill were preempted by OPA.  *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp. 2d 741 (E.D. La. 2009).  In the two decisions, the District Court has used two different, although similar, tests for determining whether the claims were preempted by OPA.  Regardless of which test is applied, the District Court erred in

dismissing the third-party complaint on the ground that ACL's admiralty and maritime claims for indemnity were preempted by OPA.

The Test from the Order and Reasons Below

In the matter under appeal, the District Court applied a three part test to determine whether OPA preempted ACL's admiralty and maritime claims for indemnity from ES&H and USES (R.Doc. 86, p. 8).   The test was taken from Judge Barbier's decision in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 808 F. Supp. 2d 943 (E.D. La. 2011), which was derived from the Supreme Court's decision in *Exxon Shipping Company v. Baker*, 554 U.S. 471 (2008).

In *Exxon Shipping*, the Supreme Court was faced with deciding whether the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.* (2000 ed. and Supp. V), a precursor to OPA, foreclosed an award of punitive damages under the maritime common law.   *Exxon Shipping Company v. Baker*, 554 U.S. 471 (2008). In allowing the award of punitive damages, the Supreme Court stated:

> … we see no clear indication of congressional intent to occupy the entire field of pollution remedies, see, e.g. *United States v. Texas*, 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993) ("In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law) (internal quotation marks omitted)); nor for that matter do we perceive that punitive damages for private harms will have any frustrating effect on the CWA remedial scheme, which would point to preemption.

*Id*. at 489.

On the basis of the Supreme Court's discussion in *Exxon Shipping*, Judge Barbier held that he should apply

> … a three-part analysis to determine if a statute preempts or displaces federal common law. First, is there a clear indication that Congress intended to occupy the entire field? Second, does the statute speak directly to the question addressed by the common law? Third, will application of common law have a frustrating effect on the statutory remedial scheme?

*"Deepwater Horizon"*, 808 F. Supp. 2d at 960. Applying that test, Judge Barbier concluded that OPA did not preempt either general maritime law claims that existed before OPA was enacted against anyone besides the designated responsible party, *id*. at 962,[4] or punitive damage claims against the responsible party. *Id*. at 963.

Although the District Court adopted the three part test from *"Deepwater Horizon,"* the Court made remarkably different conclusions on all three elements and reached a decidedly different result.

Did Congress Intend to Preempt the Field?    The District Court's conclusion that OPA "occup[ied] the entire field" of marine oil pollution and completely supplanted the general maritime law (R.Doc. 86, pp. 8-9) simply ignores the provision in OPA that

---

[4] Judge Lemelle reached the opposite conclusion in *Gabarick*. *See* 623 F. Supp. 2d at 750.

… this Act does not affect –

(1)  admiralty and maritime law; or

(2)  the jurisdiction of the district courts of the United States with respect to civil actions under the admiralty and maritime jurisdiction….

33 U.S.C. § 2751(e).  *See also "Deepwater Horizon"*, 808 F. Supp. 2d at 961 ("… it does not appear that Congress intended to occupy the entire field governing liability for oil spills, as it included two savings provisions – one that preserved the application of general maritime law and another that preserved a State's authority with respect to the discharges of oil or pollution within the state.  33 U.S.C. §§ 2718, 2751.")

Since the statute specifically preserved admiralty and maritime law, the District Court's conclusion that Congress intended OPA to occupy the entire field of maritime pollution is reversible error.

<u>Does OPA speak directly to the admiralty and maritime claims asserted by ACL?</u>  ACL concedes that where OPA explicitly sets a rule of law it preempts federal common law and general maritime law.  *See, e.g.*, *Nat'l Shipping Co. of Saudi Arabia v. Moran Trade Corp.*, 1998 AMC 163 (4th Cir. 1997); *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 56 F. Supp. 2d 104, 106 (D. Me. 1999). However, those cases are factually distinguishable.  USES, ES&H and the United States did not cite a single case to the District Court, and the District Court did not

cite one in its opinion, that held that OPA preempts ACL's implied indemnity claims against ES&H and USES under the general maritime law.

To the contrary, while discussing claims from third-parties in *Gabarick v. Laurin Maritime (America), Inc.*, 623 F. Supp. 2d 741 (E.D. La. 2009), the District Court stated that if ACL was liable for claims under OPA, then ACL "can take action to recover from third parties." 623 F. Supp. 2d at 750. The District Court's latest ruling is apparently an attempt to limit its prior language to contribution actions under 33 U.S.C. § 2709. However, this ignores OPA's savings clause which provides that

> Nothing in this act … bars a cause of action that a responsible party subject to liability under this Act … has or would have, by reason of subrogation or otherwise, against any person.

33 U.S.C. § 2710(c).

The District Court concluded that OPA directly addressed the claims asserted by ACL because it provided for the NPFC's subrogation to the claims of ES&H and USES (R.Doc. 86, p. 9). However, the indemnity claims asserted against ES&H and USES do not contest the NPFC's right to subrogation. Indeed, the District Court acknowledged that ACL did "not dispute that the United States stands in the shoes of ES&H and USES, having been subrogated to their rights…." (R.Doc. 86, p. 9). On the contrary, ACL's indemnity claims only ripen if the District Court awards damages to the NPFC on those subrogated claims.

The District Court also asserted that the indemnity claim was an attempt by ACL to avoid its strict liability under OPA (R.Doc. 86, p. 10).  This is a complete mischaracterization of ACL's position.  ACL has never denied that as a designated responsible party, it was strictly liable under OPA for the costs of cleanup.  Indeed, in compliance with that strict liability, ACL promptly entered into contracts with several OSROs, including ES&H and USES.

ACL does deny that its strict liability under OPA deprives it of its right to freedom of contract without undue interference by the federal government.  *Palmer v. Chamberlin,* 191 F.2d 532, 542 (5th Cir. 1951) ("[I]t is a matter of great public concern that freedom of contract be not lightly interfered with.") (citing *Steele v. Drummond*, 275 U.S. 199, 205 (1927)).  OPA does not authorize ES&H and USES to retain non-contractual payments made to them by the NPFC for phantom labor and equipment never actually used in the cleanup nor payments for laborers who were not properly trained or legally entitled to work at the contractual rate agreed for trained, legal workers.  The District Court's conclusion that ACL's only means of contesting the propriety of non-contractual payments to ES&H and USES was "the 'arbitrary and capricious' standard of the Administrative Procedure Act" is a denial of ACL's freedom of contract.  It also leads potentially to the absurd result of allowing ES&H and USES to retain the non-contractual payments and leaving either ACL or the NPFC holding the bag for these ill-gotten gains.

The District Court's conclusion that OPA specifically addresses ACL's admiralty and maritime claim for indemnity is reversible error.

Will application of admiralty and maritime law frustrate the effect of OPA's remedial scheme?   The District Court stated that the remedial scheme of OPA "is to encourage rapid cleanup in the wake of an oil spill" (R.Doc. 86, p. 10).  It was in fulfillment of its obligations under that scheme as a designated responsible party that ACL promptly contracted with ES&H and USES for cleanup services.  And there has never been an allegation by the United Sates or any other party that the cleanup was not performed quickly and in a timely manner.

Apparently recognizing this uncontested fact, the District Court asserted that if ACL was permitted to pursue its third-party complaint against ES&H and USES future OSROs would be "deterred by the threat of financial risk and liability exposure" (R.Doc. 86, p. 11).  OSROs do not face any liability exposure as OPA specifically grants them immunity from any "removal costs or damages which result from actions taken or omitted to be taken in the course of rendering care, assistance or advice consistent with the National Contingency Plan or otherwise directed by the President."  33 U.S.C. § 1321(c)(4)A).  Further, ACL is not seeking to transfer any financial risk to ES&H or USES.  All the third-party complaint seeks is to require ES&H and USES to honor the terms of the contracts which they freely entered into with ACL before commencing any cleanup operations.  The

history of oil spill cleanup since the enactment of OPA demonstrates that the money to be earned by OSROs for cleanup far outweighs any perceived risks relating to a responsible party's attempts to enforce a valid contract.

The District Court's conclusion that the admiralty and maritime indemnity claims contained in the third-party complaint would frustrate the remedial scheme of OPA is reversible error.

The test from the earlier *Gabarick* opinion

In *Gabarick*, the parties argued that a four factor test should be applied for determining whether OPA preempted general maritime law claims and the District Court made its decision applying that test. 623 F. Supp. 2d at 747. The test was drawn from the Second Circuit Court of Appeals' decision in *U.S. v. Oswego Barge Corp.*, 664 F.2d 327 (2d Cir. 1981). The District Court held that this Court adopted the features of *Oswego Barge* test in *United States v. M/V Big Sam*, 681 F.2d 432, 442 (5th Cir. 1982). *See* 623 F. Supp. 2d at 747. The four factors to be considered are "(1) legislative history; (2) the scope of the legislation; (3) whether judge made law would fill a gap left by Congress's silence or rewrite rules that Congress enacted; and (4) likeliness of Congress's intent to preempt 'long established and familiar principles of the common law or the general maritime law.'" 623 F. Supp. 2d at 747 (citing *Oswego Barge,* 681 F.2d at 344).

Legislative History:  In *Gabarick,* the District Court held that the legislative history indicated that "Congress's intent in enacting OPA [was] the creation of a single Federal law regarding liability for oil pollution."     *Gabarick,* 623 F. Supp. 2d at 748.  This conclusion ignores the savings provision of 33 U.S.C. § 2751(e) which preserved admiralty and maritime law.  *See Deepwater Horizon,* 808 F. Supp. 2d at 962 ("…it does not appear that Congress intended to occupy the entire field governing liability for oil spills, as it included two savings provisions…").

The District Court sought to limit the effect of the savings provision for admiralty and maritime law to preserving the federal courts' subject matter jurisdiction and not substantive admiralty and maritime law.  *Gabarick*, 623 F. Supp. 2d at 747.  However, this interpretation overlooks the fact that § 2751(e) has two sub-sections.  The second admittedly deals with subject matter jurisdiction of the federal courts.  Therefore, limiting the first sub-section to jurisdiction only would make the two sub-sections redundant.  *See In re Matter of Crist*, 632 F.2d 1226, 1233 n.11 (5th Cir. 1980) ("courts give effect, whenever possible to all parts of a statute and avoid an interpretation which makes a part redundant or superfluous").  It is axiomatic that OPA should be interpreted in such way as to avoid making the sub-sections redundant.  Since the second sub-section preserves

jurisdiction, the first sub-section must be interpreted to preserve substantive admiralty and maritime law.

<u>Scope of OPA</u>:  The District Court held in *Gabarick* that "OPA defines its scope explicitly through its statutory text." *Id.* at 748.  ACL agrees.  The statutory text explicitly states that OPA does not preempt ACL's admiralty and maritime indemnity claim. *See* 33 U.S.C. § 2751(3)(i).

<u>Whether judge-made admiralty and maritime law would fill a gap in OPA left by Congress's silence or rewrite rules that Congress enacted</u>:  OPA established a procedure for OSROs to submit a claim to the NPFC if their invoices were not paid within 90 days of submission to the responsible party of a properly supported invoice.[5]  However, not surprisingly, the authors of OPA did not include a section in the statute to permit an OSRO who was paid more by the NPFC than it earned under its contract with the responsible party to retain that non-contractual and wrongful payment.  Allowing ACL to proceed with its admiralty and maritime indemnity claim set forth in the third-party complaint would fill that gap in the statute.   On the other hand, as noted in discussing the test applied by the District Court in this matter, allowing the third-party complaint to stand would not interfere with the overall remedial scheme of OPA (*see supra* pp. 17-18).

---

[5] ACL contends that the MAGI audit shows that neither ES&H or USES submitted properly supported invoices.  The 90 day period never expired before the claims were submitted to the NPFC.

<u>Likeliness that Congress intended OPA to preempt long established and familiar principles of the general maritime law</u>:  This factor is very similar to the first part of the test applied by the District Court in the matter below.  As shown in the discussion above (*see supra* p. 14), Congress did not intend to preempt ACL's admiralty and maritime law indemnity claims against ES&H and USES.  On the contrary, Congress enacted two provisions specifically preserving those claims.  33 U.S.C. §§ 2751(3)(i) and 2710(c).

<u>Conclusion</u>

Regardless of whether the issue should be decided under the three part test applied in the order and reasons below (R.Doc. 86) or under the four factor test applied earlier in *Gabarick,* 623 F. Supp. 2d at 747, the District Court's conclusion that OPA preempted ACL's admiralty and maritime indemnity claims against ES&H and USES is wrong.  The 54(b) judgment (R.Doc. 93) should be vacated and the matter remanded to the District Court for re-instatement of ACL's third-party complaint.

## POINT II.

### ACL SEEKS TO PREVENT ES&H & USES FROM OVER-BILLING FOR THEIR CLEANUP SERVICES

ACL has never denied that as the designated responsible party under OPA it was required to promptly undertake the cleanup of the oil spill (R.Doc. 11, ¶ 15).

Indeed, had ACL declined to undertake the cleanup, it could have forfeited its defenses under OPA. *See* 33 U.S.C. § 2703(c)(2). However, that does not mean that ACL is not entitled to limit the payments to ES&H & USES to the amounts properly due under the contracts between ACL and ES&H and USES, respectively. ES&H and USES should not be paid for either phantom labor and equipment that was not actually supplied or paid at the contractual rate for untrained or illegal laborers.[6]

ACL's position is that the NPFC has paid ES&H and USES for phantom labor and equipment not actually supplied and has paid ES&H and USES at the contractual agreed rate applicable to properly qualified, legal laborers for untrained or illegal laborers. In the first instance, ACL denies that it is liable to NPFC for such unwarranted payments to ES&H and USES (R.Doc. 10). However, ACL acknowledges that its defense to the claim by the NPFC may be subject to an

---

[6] ES&H and USES may assert claims for *quantum meruit* for the services provided by the untrained or illegal laborers, although generally such equitable relief is denied to a party with unclean hands. *Ellipso, Inc. v. Mann*, 583 F. Supp. 2d 1 (D.D.C. 2008) (*quantum meruit* claim dismissed because of "unclean hands"); *Jandrain v. Lovald*, 351 B.R. 679, 684 (D.S.D. 2006) (claim for *quantum meruit* denied because of claimant's "unclean hands"); *Keybank National Assoc. v. Perkins Rowe Assocs., Inc.*, No. 09-497-JJB-SR, 2011 WL 3204687, at *2 (M.D. La. July 27, 2011) (claimant with "unclean hands" will be denied equitable relief); *Arzoomanian v. British Telecommunications, PLC*, No. 03-374 PGS, 2007 WL 132983, at *15 (D.N.J. Jan. 12, 2007) (claimant needs "clean hands" to claim equitable relief of *quantum meruit*). But the *quantum meruit* rate of compensation is not the same as the contractual rate, as it must be based upon a full review of the value of the services provided by the untrained or illegal personnel.

arbitrary and capricious standard under the Administrative Procedure Act.[7]

Therefore, as an alternative, ACL filed a third-party complaint against ES&H and USES seeking reimbursement for any payments made by the NPFC to ES&H and USES that were not proper under the contractual agreements between ACL and ES&H and USES.

Every contract has an implied duty of good faith which prevents one party to the contract from charging the other party for equipment and labor not actually provided or from charging for untrained, illegal labor at the contractually agreed rate for properly trained, legal labor.

Admiralty law has long recognized the doctrine of implied contractual indemnity.  *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124 (1956).[8]  As the Second Circuit has stated:

---

[7] The United States seemed to concede (R.Doc. 35-1, pp. 14 – 15) that its claim with respect to the payments to ES&H and USES is solely for subrogation and that its rights are no greater than the rights of ES&H and USES.  If that is so, the arbitrary and capricious standard may not be applicable.  But if the arbitrary and capricious standard does apply, ACL contends that it was arbitrary and capricious for the NPFC to pay for labor and equipment not actually supplied or to pay for untrained, illegal labor at the contractual rates agreed for properly trained, legal workers.

[8] Although the specific holding in *Ryan Stevedoring* has been overturned by statute, 33 U.S.C. § 905, the concept of implied indemnity is still well recognized in admiralty law.

> Indemnity, apart from express contract, can … be implied in fact.  If it is implied in fact it is said to be derived from the nature of the relationship of the parties.

*A/S D/S Svendborg v. Marine Engine Specialties Corp.*, 501 F.2d 376, 380 (2d. Cir. 1974).  "One overriding principle may be distilled from the cases discussing this implied cause in maritime contracts: where some act of the indemnitor performed within the sphere of the contractual relationship subjects the indemnitee to liability without fault, indemnity is due."  *Hamilton v. Canal Barge Co., Inc.*, 395 F. Supp. 978, 989 (E.D. La. 1975).  *Nassif v. Sunrise Homes, Inc.* involved a suit brought by a homeowner against the seller and the homebuilder; the homebuilder in turn filed a third-party complaint against the engineering firm that was actually responsible for the alleged defect.  *Nassif v. Sunrise Homes, Inc.*, 98-C-3193, 739 So.2d 183, 185 (La. 06/29/99).   The court held that the engineering firm was required to indemnify the homebuilder for its attorney's fees on the basis of an implied indemnity owed by the engineering firm to the homebuilder. The *Nassif* court found that "[a]n implied contract of indemnity arises only where the liability of the person seeking indemnification is solely constructive or derivative and only against one who, because of his act, has caused such constructive liability to be imposed."  *Id.* at 185; *see Robinson v. Louisiana Dock Co.*, Nos. 99-1996 and 00-3601, 2001 WL 1175114 (E.D. La. October 3, 2001) (upholding implied indemnity where liability of the party seeking indemnity

was solely constructive or derivative liability, such as strict liability). In this case, the United States is seeking to impose strict liability upon ACL for the sums improperly over-billed by ES&H and USES. ACL has a cause of action for implied indemnity against ES&H and USES.

MAGI was hired to audit the invoices from the OSROs, including ES&H and USES, according to the "universal practice" in oil spill responses (R.Docs. 50-1 and 50-3, Lane Decl. ¶ 3). In auditing the invoices from ES&H and USES, MAGI identified large amounts of charges not properly supported (R.Doc. 50-1, Lane Decl. ¶ 5; R.Doc. 50-3, Lane Decl. ¶ 5). For instance, ES&H charged $98,170 for "18" Containment Boom not charged in accordance with agreed step down rates"; $439,200 for "Response Boats on invoices that never went through decon" and another $616,050 for "Barge Boats on invoices that never went through decon" (R.Doc. 50-1, Lane Decl. Exh. 3, p. 1). Similarly, USES charged $1,115,208.25 for "Personnel not signed in/hours charged in excess of operational period approved by [the Incident Command] Safety Officer" and another $579,345 relating to charges for booms either because they were not invoiced at the agreed rate or because ACL was being charged for more booms than were actually used in the cleanup (R.Doc. 50-3, Lane Decl. Exh. 4, p. 2). Rather than trying to explain to MAGI these apparent overcharges, ES&H and USES filed claims with the NPFC (R.Doc. 11, ¶ 20).

Although ACL provided the NPFC with the full MAGI audits of ES&H's and USES's invoices, ACL was never advised what, if any, additional documentation was presented by ES&H and USES to the NPFC. ACL understands that the NPFC did not require ES&H or USES to provide either training certificates or the federally required I-9 forms for the laborers but rather relied upon affidavits from ES&H and USES that all of the laborers were properly trained, legal workers. The limited information presented to ACL before ES&H and USES withdrew from the audit process raises serious questions as to the veracity of the affidavits (R.Docs. 50-2 and 50-4). If ES&H's and USES's affidavits were false and ES&H and USES in fact had supplied untrained, illegal laborers, then ES&H and USES must reimburse either ACL or the United States directly. *Cf. Smith v. Noble Drilling Co., Inc*, 272 F. Supp. 321, 322 (E.D. La. 1967) ("Money paid under a mistake of fact can be recovered even though the payer was negligent or was carelessly ignorant of the facts."); *Prudence Realization Corp v. Jackson*, 212 F.2d 362, 366 (2d Cir. 1954) (overpayment inures to the benefit of the guarantor); *In re Cornmesser's Inc.*, 264 B.R. 159, 164 (W.D. Pa. 2001) (guarantor of payment entitled to refund of any overpayment); *Century Building Partnership, L.P. v. SerVAAS*, 697 N.E.2d 971, 974 (Ind. Ct. App. 1998) ("Where a party pays money to another party under a mistake of fact that a contract or other obligation required such a payment, the payor is entitled to restitution." (citing Restatement of

Restitution § 18 (1937))); *Frankel v. ICD Holdings, Inc.*, 939 F. Supp. 1124, 1130 (S.D.N.Y. 1996) (guarantor's remedy for overpayment is to bring action for refund); *First National Bank of Dickson v. Garrett*, 36 B.R. 432, 433 (M.D. Tenn. 1984) (codebtor entitled to any refund of overpayment).

## CONCLUSION

The District Court erred in holding as a matter of first impression that OPA preempted ACL's claim for indemnity for any sums ACL is held liable to the United States for payments to ES&H and USES for improper billings under their contracts with ACL.  Therefore, the District Court's Rule 54(b) judgment should be vacated, ACL's third-party complaint reinstated and the matter remanded to the District Court for further proceedings.

This 15th day of July, 2013.

*/s/ Glenn G. Goodier*
GLENN G. GOODIER (#06130) – Lead Counsel
RICHARD D. BERTRAM (#17881)
Jones Walker LLP
201 St. Charles Avenue – 48th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8174
Fax: (504) 589-8174
Email: ggoodier@joneswalker.com
Attorneys for American Commercial Lines LLC, Appellant

OF COUNSEL:

JOHN A. V. NICOLETTI
TERRY L. STOLTZ
Nicoletti Hornig & Sweeney
Wall Street Plaza, 88 Pine Street, 7th Floor
New York, New York 10005-1801
Telephone: (212) 220-3830
Fax: (212) 220-3780
Email: jnicoletti@nicolettihornig.com
Attorneys for American Commercial Lines LLC, Appellant

# CERTIFICATE OF SERVICE

I do hereby certify that I have on this 15th day of July, 2013 served a copy of the foregoing pleading on counsel for all parties to this proceeding by electronic filing and by mailing the same by United States mail, properly addressed and first class postage prepaid:

Edwin C. Lazier
James T. Rogers, III
Margot L.K. Want
Adams & Reese, L.L.P.
Suite 4500
701 Poydras Street
One Shell Square
New Orleans, LA  70139
Attorneys for Third Party Defendant – Appellee, Environmental Safety & Health Consulting Services, Incorporated

William S. O'Neil, Esq.
Suite 340
2000 S. Dairy Ashford Street
Houston, TX  77077
Attorney for Third Party Defendant – Appellee, United States Environmental Services, L.L.C.

William E. O'Neil
O'Neil Group, L.L.C.
5905 Cleveland Place
Metarie, LA 7003
Attorney for Third Party Defendant – Appellee, United States Environmental Services, L.L.C.

Lawrence I. Kiern
Winston & Strawn, L.L.P.
1700 K Street, N.W.
Washington, DC  20006-3817
Attorneys for Third Party Defendant – Appellee, United States Environmental Services, L.L.C.

Michael A. Dilauro
Sara S. Keast
U. S. Department of Justice
Torts Branch, Civil Division
P. O. Box 14271
Washington, DC 20044-4271
Attorney for United States of America


*/s/ Glenn G. Goodier*
GLENN G. GOODIER
Lead Counsel for
American Commercial Lines LLC, Appellant

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

      This brief contains 6,479 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in Times New Roman – 14 point.

*/s/ Glenn G. Goodier*
GLENN G. GOODIER
Attorneys for American Commercial Lines LLC, Appellant
Dated:  July 15, 2013